RENDERED: SEPTEMBER 28, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2014-SC-000512-DG

AEP INDUSTRIES, INC.                                           APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                       CASE NO. 2013-CA-000132
WARREN CIRCUIT COURT NO. 12-CI-00467

B.G. PROPERTIES, INC.                                          APPELLEE

**OPINION OF THE COURT BY JUSTICE VENTERS**

**<u>VACATING AND REMANDING</u>**

AEP Industries, Inc. (AEP) appeals from an opinion of the Court of Appeals which vacated a final order of the Warren Circuit Court granting AEP's motion for specific performance of a real estate option contract between AEP and B.G. Properties, Inc. (BG). The Court of Appeals held that the circuit court granted specific performance of the option contract prematurely because disputed issues of fact material to that form of relief had been left unresolved in the circuit court. The Court of Appeals remanded the matter for resolution of those issues. We granted discretionary review, and upon review we vacate the opinion of the Court of Appeals and remand the action to the trial court with direction to dismiss any remaining claims.

## I. FACTUAL AND PROCEDURAL BACKGROUND

BG and its predecessor in interest owned an industrial building located on a 19.7-acre tract in Bowling Green, Kentucky. The building had been used for manufacturing flexible plastic packing products and contained features uniquely suited to that purpose. AEP leased the property from BG for use in its business of manufacturing flexible plastic packaging. AEP and BG were mutually obligated under several agreements concerning the property. Those agreements provided AEP with an option to purchase the property.[1]

The specific terms of the purchase option are provided in two documents: the "Consent to Assignment of Lease and Grant of Option to Purchase" made in 2001 and the "Agreement Modifying Sublease and Option" made in 2010. These two documents collectively provide the terms of AEP's option to purchase the property. We refer to those documents together as the "Option Agreement" or "the Agreement."

The Option Agreement expressly provided the following four-stage process for ascertaining the purchase price if AEP decided to exercise its purchase option. First, the parties would attempt to negotiate a fair purchase price. Second, if the negotiation failed to achieve a mutually agreeable price, then BG would deliver to AEP an appraisal of the property by a qualified

---

[1] More specifically, AEP subleased the property from a primary leaseholder and certain of the agreements were initially executed by the parties' respective predecessors in interest; however, these details are not relevant to our review.

2

professional appraiser[2] with the appraisal subject to special requirements as further described below. Third, if AEP declined to purchase at BG's appraised value, then AEP would obtain its own qualified appraisal and submit it to BG. Fourth, and finally, if BG rejected AEP's appraised value, then AEP's appraiser and BG's appraiser would together select a third appraiser whose independent valuation of the property would become the final purchase price.

The Option Agreement included two other terms that are significant in our review: 1) every appraisal of the property undertaken to determine the purchase price would ascertain "the fair market value based on its highest and best use, plus the value of all special features and fixtures located therein for AEP's use as an extrusion and flexible packaging manufacturing facility;" and 2) the Agreement granted AEP seven days after the final determination of the purchase price under stage four to withdraw the exercise of its option to purchase the property.

In August 2011, AEP informed BG that it intended to exercise the option to purchase the property, thereby triggering the four-stage process for determining the price. The initial attempt to negotiate a purchase price was unsuccessful. BG then obtained an appraisal by Brantley Appraisal Company, which valued the property at $7,500,000. AEP rejected that price, and as required by the Option Agreement, AEP then obtained its own appraiser, selecting CBRE, which valued the property at $3,550,000.

---

[2] The Option Agreement set forth particular qualifications for the appraisers used.

3

BG rejected CBRE's valuation. AEP then attempted to initiate the final stage of the process, the selection of the third appraiser, but BG refused to cooperate. BG claimed that AEP did not properly comply with the third stage of the pricing process because the CBRE appraisal tendered by AEP did not meet the special conditions of the Option Agreement for a value based upon "the highest and best use of the property" and for the inclusion of the "special features and fixtures located therein for AEP's use as an extrusion and flexible packaging manufacturing facility." Accordingly, BG insisted that before moving to the fourth stage of the pricing process, AEP was obligated first to submit an appraisal that complied with the special conditions of the Option Agreement.

Instead of acceding to BG's demand to submit a different appraisal, AEP filed an action in the Warren Circuit Court alleging that BG was in breach of the Option Agreement for failing to proceed with the selection of the third appraiser. AEP sought a court order compelling BG to participate in the appointment of a third appraiser.

BG responded to the suit with an answer and counterclaim. BG invoked the well-settled equitable principle that specific performance of a contract will only be granted when the party seeking the specific performance has itself complied with all terms of the contract. To be granted specific performance of an agreement for the sale of real property, all conditions precedent to the sale must have been complied with by the party seeking such specific performance.[3]

---

[3] *See* 25 *Williston on Contracts* § 67:73 (4th ed. 2013) ("The performance of all conditions precedent is generally required before specific performance will be

4

BG asserted that AEP's failure to submit a proper appraisal at the third stage of the pricing process was a breach of the Option Agreement by AEP that barred its claim for specific performance. BG also claimed that in addition to the disagreement about the CBRE appraisal, AEP had also breached the provision of the lease agreement requiring it to keep the roof of the building in good repair. BG contended that the appraisals used to determine the purchase price should not be discounted by the deteriorated condition of the roof that AEP had failed to maintain.

Eventually, upon motions for summary judgment, the circuit court determined that CBRE's appraisal complied with the conditions of the Option Agreement. The court directed BG to proceed with the fourth stage of the appraisal process, the selection of the third and final appraiser. The circuit court fixed a deadline for obtaining that appraisal and held the remainder of the action in abeyance pending its completion. In compliance with the circuit court's order, BG and AEP selected G. Herbert Pritchett as the third appraiser. Pritchett valued the property at $3,834,000.

AEP was satisfied with that price, but BG refused to transfer the property, claiming that Pritchett's appraisal suffered the same deficiency as CBRE's appraisal: it failed to account for "the highest and best use of the property" as defined in the Option Agreement and it failed to factor in the special features that made the property uniquely suited to AEP's

---

granted."); *West Ky. Coal Co. v. J.D. Nourse*, 320 S.W.2d 311 (Ky. 1959); *Puritan Homes, Inc. v. Abell*, 432 S.W.2d 632 (Ky. 1968).

manufacturing process, as set forth in the Option Agreement. BG also complained that Pritchett's appraisal unfairly diminished the value of the property due to the poor condition of the roof that AEP had failed to maintain.

AEP then moved the circuit court for an order compelling specific performance of the Option Agreement by directing BG to convey the property at Pritchett's appraised value of $3,834,000. In addition, AEP demanded a credit against the purchase price of $407,987.37 for the additional rent payments it had incurred under the lease due to BG's failure to voluntarily cooperate in the selection of the third appraiser in a timely manner.[4] BG responded by reiterating its position that AEP had initially breached the agreement by failing to tender a qualifying appraisal and for that reason it could not demand specific performance of the very contract it had breached.

By order dated December 19, 2012, the circuit court rejected BG's arguments. It determined that Pritchett's appraisal of the fair market value of property at $3,834,000 properly accounted for the site's "special features and fixtures" and was consistent with the terms of the Option Agreement and that court's previous order. The circuit court also concluded that the Pritchett appraisal properly accounted for the "roof issue" and, therefore, no variance from the appraised value was required to accommodate that concern. The

---

[4] But for BG's opposition to the appraisals, the transfer of property pursuant to the parties' Option Agreement, and the corresponding cessation of AEP's rent obligation under the lease, would have occurred by June 1, 2012. The rent credit was calculated to compensate AEP for the additional rent paid between June 1, 2012 and the eventual transfer of the property on December 31, 2012.

6

circuit court also granted AEP's demand for a credit for the additional rental payments incurred due to BG's delaying the transfer of the property during the dispute. The December 19, 2012 order directed BG to convey the property to AEP for the price fixed by Pritchett's appraisal, $3,834,000.00. The circuit court also awarded AEP claimed rent credit of $407,987.37, for a net payment obligation of $3,426,012.63 due to BG.

Rather than seeking immediate relief to abate the enforcement of the order and thereby avoid transferring the property for what it regarded as inadequate consideration, and rather than tendering a conditional deed stating the involuntary nature of the conveyance and reserving its objection to the forced sale at an inadequate price, BG filed with the circuit court a "Motion for Approval of Deed Form and an Order Preserving Claims," tendering a conventional general warranty deed for the unconditional transfer of the property to AEP in fee simple for the stated consideration of $3,426,012.63. [5]

AEP responded to BG's motion, voicing no objection to the form of the deed but vigorously opposing the entry of an order that would sanction the transfer of title while leaving the consideration to be paid for the property open to appeal and further litigation. AEP argued that a transfer of title leaving the purchase price for later determination would violate AEP's right under the

---

[5] It is worth noting that the purchase price as listed on the deed is not consistent with the Pritchett appraisal value but instead directly incorporates the trial court's ruling on the rent credit issue. The stated consideration equals the appraised value of the property minus the unrelated rent credit. The effect of this anomaly has not been addressed by the parties, and we express no opinion upon it.

Option Agreement to reject the final price and walk away from the option. AEP argued that BG's remedy was to seek a stay of the enforcement of the circuit court order pending appeal.

The circuit court entered an order approving the form of the deed but otherwise denying BG's requested relief. The order was designated as final and appealable pursuant to CR 54.02(1).

Immediately thereafter, BG executed the deed acknowledging the receipt from AEP of the stated consideration of $3,426,012.63 for which BG did expressly "bargain, alien, grant, deed, sell, and convey unto [AEP] in fee simple [the subject property]." AEP promptly recorded the deed. BG did not record a *lis pendens* notice to signify its retention of ongoing litigative interest in the property.

Before completing the transfer of the property, BG had neither asked the circuit court to fix the amount of a supersedeas bond nor had it posted a supersedeas bond. BG undertook no measures to forestall the transfer of the property to AEP for the stated price of $3,426,012.63. Instead, after closing on the transfer of the property, BG filed a notice of appeal seeking review of the circuit court's order awarding specific performance of the Option Agreement.

Although BG presented the Court of Appeals with six allegations of error germane to the disputed appraisal process and the valuation of the property, BG requested no relief to negate the conveyance of the property. BG did not argue that the conveyance should be set aside or disturbed in any way other than a re-assessment of the sales price.

8

The Court of Appeals vacated the circuit court's order and remanded the case for further proceedings, reasoning that the circuit court had not adequately addressed the threshold issue of whether, as alleged by BG, AEP had first violated the Option Agreement with a faulty appraisal and thus was barred from seeking specific performance. Citing this Court's decision in *Dreamers LLC v. Don's Lumber & Hardware, Inc.,* 366 S.W.3d 381 (Ky. 2011), the Court of Appeals rejected AEP's argument that BG's conveyance of the property and acceptance of the consideration rendered moot the dispute over the property's value.

We granted discretionary review to examine whether BG can continue to challenge the enforcement of the Option Agreement after it conveyed the property to AEP by general warranty deed without reservation, and correspondingly accepted the stated consideration for the transfer. We conclude that it cannot. BG's execution and delivery of a general warranty deed without an express reservation of rights and its acceptance of the stated consideration foreclosed its option to further challenge the enforcement of Option Agreement. Accordingly, we reverse the Court of Appeals.

## II. ANALYSIS

For the reasons stated below, we conclude BG's execution and delivery of the general warranty deed conveying the property to AEP in fee simple, without qualification or condition, coupled with its unconditional acceptance of the purchase price renders the controversy moot. Assuming, as BG contends, that the circuit court erred by granting specific performance of the Option

9

Agreement at the purchase price fixed by the Pritchett appraisal, then BG's appropriate appellate remedy would be the reversal of the circuit court's order and the restoration of the parties to the *status quo ante*. Reversing the circuit court's order would put the parties back in the circuit court to adjudicate the issues pertinent to establishing a purchase price for the execution of the Option Agreement and allow them to litigate the collateral issues arising from the parties' lease. That relief is now unattainable because the property has now been unconditionally sold. BG offers no argument seeking to unwind, or nullify, that sale to restore the *status quo ante*. Moreover, BG's requested remedy is a chance to re-litigate upon remand *only* the purchase price of the property without nullifying the conveyance. That result does not restore the *status quo ante* because it eliminates AEP's contractual right to withdraw from the purchase within seven days if it objects to the final price.

BG did not preserve its objections to the trial court's order of specific performance of the Option Agreement by posting a supersedeas bond pursuant to CR 62.03, CR 73.04, and CR 73.06. Nor did BG avail itself of an alternative means of staying the order by seeking immediate relief from the Court of Appeals staying the matter pending appellate review. Instead, BG transferred the property. As we held in *Green Valley Environmental Corp. v. Clay*, citing Section 111 of Kentucky's Constitution,[6] the Court of Appeals has the power

---

[6] In pertinent part, Section 111 of the Kentucky Constitution provides: "The Court of Appeals . . . may issue all writs necessary in aid of its appellate jurisdiction, or the complete determination of any cause within its appellate jurisdiction."

"to grant a stay pending appeal in order to maintain the status quo of the case pending before it on review." 798 S.W.2d 141, 143–144 (Ky. 1990) (citing *Crady v. Cranfill,* 371 S.W.2d 640 (Ky. 1963)). In summary, BG sought none of the available remedies that would have enabled it to avoid the immediate enforcement of the trial court's order and defer, at least temporarily, the conveyance of the property for what it regarded as an improperly determined price.

While not dispositive, the opinions of our predecessor Court in *Rose v. Cox,* 179 S.W.2d 871 (Ky. 1944), and *Sedley v. Louisville Trust Co.,* 419 S.W.2d 531, 532 (Ky. 1967), are instructive even though they contain important factual differences. Those cases establish that when property is sold to a third party pursuant to a judicial sale ordered by the trial court, in the absence of a supersedeas bond or other stay of execution, a subsequent determination by an appellate court that the order directing the sale was erroneous does not void the sale. "Where the court has jurisdiction of the parties and the subject matter of the suit, and has statutory authority to decree the sale, a subsequent reversal of the judgment decreeing the sale is a mere declaration that the judgment is erroneous, but does not render it void." *Rose,* 179 S.W.2d at 872. "The fact that the judgment ordering the sale of the property was not superseded prevents us from granting [the Appellant] the relief to which she is allegedly entitled" and the case is thereby moot. *Sedley,* 419 S.W.2d at 533.

Obviously, the instant case does not involve a sale to a third party. However, upon review of authority from other jurisdictions that have more

11

precisely addressed the issue before us, we are persuaded that the same result is compelled under the circumstances that confront us here.

For example, in *Dahlin v. Amoco Oil Corp.*, 567 N.E.2d 806 (Ind. App. 1991), the Dahlins leased a parcel of land to Amoco Oil. The lease also gave Amoco the option to purchase the property under certain conditions. Amoco exercised its option to purchase the Dahlins' land. When the Dahlins refused to convey the land, Amoco filed an action for specific performance. The Dahlins counterclaimed for breach of contract and unjust enrichment. The trial court granted summary judgment for Amoco on its specific performance claim; thereafter, the Dahlins sold the real estate to Amoco. Addressing the Dahlins' argument on appeal that the trial court erred by granting summary judgment on Amoco's specific performance claim, the Indiana Court of Appeals stated as follows:

> If a party to a judgment voluntarily acquiesces in or recognizes the validity of such judgment or otherwise takes a position which would be inconsistent with any theory other than the validity of the judgment, he has impliedly waived his right to contest the validity of the judgment on appeal.

*Id.* at 809.

The Dahlins' conveyance of the property to Amoco was inconsistent with their appellate position that the order compelling specific performance was erroneous. "By electing instead to sell the property, they have waived their right to argue on appeal that the specific performance decree was invalid and unenforceable, and therefore their appeal on this issue is moot." *Id.* at 810.

12

Similarly, in *Schuppener v. Bruno*, 395 So.2d 1234 (Fla. Dist. App. 1981), the contractual purchasers of land sued for and obtained a judgment ordering specific performance of the contract directing the sale of the property. The sellers appealed, but while the appeal was pending, the sellers accepted the purchase price and recorded the purchaser's mortgage on the property in question. The Florida court held that "[u]nder these circumstances, the issues in [this] appeal . . . appear to us to be moot." *Id.* at 1235.

Our review of the unusual circumstances of this case is also guided and influenced by the strong principles of law that accord a measure of sanctity to the language of deeds and other written and recorded instruments of title. "As the deed was acknowledged and lodged for record the day it bears date, it was constructive notice to the whole world in whom the legal title was vested." *Ott v. Ott's Administrator*, 2 Ky. Op. 114 (1867);[7] *see Haven v. Wallace*, 160 S.W.2d 619, 622 (Ky. 1942) ("This deed was of record and constituted constructive notice to the world that appellant had retained this right or reservation in and to the rentals on the land."); *Wells Fargo Financial Kentucky, Inc. v. Thomer*, 315 S.W.3d 335, 338–339 (Ky. App. 2010) ("A recorded mortgage serves the purpose of establishing the lender's interest in the land that secures the debt and notice to the world of the lien created thereby."). Significant legal consequences flow from the language used to convey interests in real property,

---

[7] 1867 WL 3569 at *1 (Ky. Nov. 21, 1867).

13

and because the deed gives "notice to the world," its effects extend beyond the limited interests of the parties.

The words of the deed are so important that, upon its delivery and acceptance, the deed "extinguishes or supersedes the provisions of the underlying contract for the conveyance of the realty." *Drees Co. v. Osburg,* 144 S.W.3d 831, 832 (Ky. App. 2003) (citation omitted). *Borden v. Litchford,* 619 S.W.2d 715, 717 (Ky. App. 1981) reflects the nearly-universal principle that the "merger doctrine holds that all prior statements and agreements, both written and oral, are merged into the deed and the parties are bound by that instrument." Subject to limited exceptions which are not applicable here,

> the acceptance of a deed tendered in performance of an agreement to convey merges the written or oral agreement to convey in the deed, and, thereafter, the provisions of the underlying contract governing the transfer of the property are extinguished and the deed regulates the rights and liabilities of the parties.

77 Am. Jur. 2d *Vendor and Purchaser* § 227 (2017). As there is a presumption of merger upon the delivery and acceptance of the deed, contrary intentions of the parties must be clear and manifest and may be shown from the terms of the deed itself. *See Vernon v. Vernon,* 277 S.W. 248, 248 (Ky. 1925).

There is no doubt that the merger doctrine would control the issue if BG had simply transferred the property pursuant to the terms of the Option Agreement without the intervention of the circuit court order. We see no reason for departing from the doctrine when the transfer resulted from a court order enforcing the terms of the Option Agreement. In either case, any unresolved conditions arising from the contract or the court order could be

14

preserved by incorporation into the deed. In that respect, it is significant that the circuit court did not dictate the terms of the deed. Although at BG's request the circuit court approved the form of the deed, BG prepared the deed and completely controlled its terms and conditions. BG could have preserved its objection to the consideration by referencing that fact, along with the pending litigation, in the deed. Instead, the deed contains no limitation or reservation about the consideration to be paid for the property; and it contains no reference to the terms of the option contract for establishing the fair market value of the property. Most significantly, it incorporates no language to signify that the transaction is anything other than a completed, arm's length transaction between a willing buyer and willing seller for a mutually agreed-upon consideration. Consistent with the merger doctrine, all else outside of the four corners of the deed relating to the purchase price of the property was merged into the deed.

The Court of Appeals substantially based its decision on *Dreamers LLC v. Don's Lumber & Hardware, Inc.*, 366 S.W.3d 381 (Ky. 2011). We said in *Dreamers*:

> It has long been the law in Kentucky that 'a party . . . does not need to post a supersedeas bond to take an appeal from a judgment,' though '[t]he failure to post a bond . . . leaves the party who obtained the judgment free to execute on it.'

*Id.* at 384 (quoting *Elk Horn Coal Corp. v. Cheyenne Resources, Inc.*, 163 S.W.3d 408, 419-420 (Ky. 2005)). We held that the judgment-debtor did not forfeit its right to appeal by paying the money to the plaintiff in lieu of posting a supersedeas bond or suffering an execution on the judgment pending appeal.

15

BG contends that its compliance with the judgment compelling specific performance of the real estate option contract should be treated the same. BG's position is if it successfully established on appeal that AEP was not entitled to specific performance of the Option Agreement, then all that would be required is another round of appraisals to determine the purchase price. That interpretation, however, is incorrect. It overlooks the fact that reversing the order that compelled specific performance of the Option Agreement must also invalidate the deed conveying title because the need to re-determine the purchase price also revives AEP's contractual right to decline the purchase if it dislikes the final price.

*Dreamers* involved a monetary judgment; the *res* awarded by the judgment was a fungible sum of money. As to that *res Dreamers* holds that a defendant subject to an adverse money judgment may, instead of purchasing a supersedeas bond to cover the payment of his debt and avoid attachment or garnishment of his property, as well as the accrual of expensive post-judgment interest, simply pay the judgment without forfeiting his right of appeal. Of course, by doing so, the defendant accepts the risk that, upon reversal of the judgment, the plaintiff may have disbursed the money and be unable to refund it. Either way, the parties are generally indifferent to the specific cash that funds the payment and re-payment; and in most situations, the exchange involves no tangible money at all, but simply checks or electronic transfers from one account to another.

16

In contrast, however, here the *res* subject to the order compelling specific performance is real estate. The *res* in dispute is not a fungible quantity of money; it is uniquely tangible land. Historically, laws governing the transfer and exchange of land differ fundamentally from the laws governing the exchange of cash or its electronic equivalent. *See, for example, Baroi v. Platinum Condominium Development, LLC,* 874 F. Supp. 2d 980, 984 (Nev. Dist. 2012) ("Nevada will enforce contractual obligations through the remedy of specific performance where appropriate, particularly in real estate transactions because real property is 'unique,' and damages therefore may be an inadequate remedy."); *In re Arnold and Baker Farms,* 177 B.R. 648, 661 (Bankr. App. 9th Cir. 1994) ("each parcel of real property is unique"); *Consolidated Rail Corp. v. Michigan,* 976 F. Supp. 1085, 1089 (W.D. Mich. 1996) ("[I]nterference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute."). The merger doctrine is itself an example of how the law applies special precautions to the conveyance of land that are not applicable to the transfer of money. These differences are reason enough to distinguish the rule as stated in *Dreamers* from the situation before us in this case.

We further reject the notion implied by the Court of Appeals that requiring the posting of a supersedeas bond to stay a court-ordered conveyance of land would deprive a litigant of the right guaranteed by Section 115 of the

17

Kentucky Constitution to appeal from an adverse judgment.[8] The prospective appellant in any case may pursue the constitutionally-mandated right to appeal without posting a supersedeas bond. The bond does not impinge upon the right of appeal; the bond, when posted by an appellant, stands as a collateral obligation, acknowledging the dignity of the judgment in recognition of the fact that the appellant is depriving the appellee of the benefits of the judgment pending the finality of the appellate process.

## III.    CONCLUSION

For the foregoing reasons, the opinion of the Court of Appeals is vacated. BG's counterclaim and amended counterclaim asserted claims that a price adjustment was warranted as a result of AEP's alleged primary and continuing breach of the Option Agreement, the allegedly faulty appraisal of CBRE, AEP's alleged failure to maintain the roof of the building, and AEP's alleged breach of the duty of good faith and fair dealing. We are satisfied that BG's failure to preserve its objections to the circuit court's final order by superseding it with an appropriate bond or obtaining a stay of its enforcement, coupled with the completion of the transaction and the application of the merger doctrine, precludes any further relief sought by BG. Accordingly, we remand this action

---

[8] Kentucky Constitution Section 115 provides, in pertinent part: "In all cases, civil and criminal, there shall be allowed as a matter of right at least one appeal to another court . . . ."

to the Warren Circuit Court with directions to dismiss the counterclaim and amended counterclaim.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Glenn Alan Cohen
Seiller Waterman, LLC
Meidinger Tower, 22nd Floor
462 S. Fourth Street
Louisville, KY 40202

Paul Joseph Hershberg
Gray & White
713 E. Market Street
2nd Floor
Louisville, KY 40202

Jason Conti
Foley & Lardner, LLP
500 Woodward Avenue, Suite 2700
Detroit, MI 48226

COUNSEL FOR APPELLEE:

David W. Anderson
Michael Scott Vitale
English, Lucas, Priest & Owsley, LLP
1101 College Street
P.O. Box 770
Bowling Green, KY 42102-0770